Filed 10/28/20  P. v. Roberts CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B298935 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA141880) |
| v. | |
| VICTOR ROBERTS et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County.  Raul Anthony Sahagun, Judge.  Affirmed as modified.

Joanna Rehm, under appointment by the Court of Appeal, for Defendant and Appellant Victor Roberts.

Paul Couenhoven, under appointment by the Court of Appeal, for Defendant and Appellant Luis Aguilar.

Xavier Becerra, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Blythe J. Leszkay and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

————————————————

Luis Aguilar shot and killed a rival gang member outside a convenience store. Aguilar's fellow gang member, Victor Roberts, was present during the incident and provided him the gun. A jury convicted both defendants of murder, and it found true firearm and gang allegations. On appeal, the defendants argue there was insufficient evidence supporting the gang allegations. They also contend the trial court erred by failing to instruct the jury on imperfect self-defense, limiting the cross-examination of a prosecution witness, and declining to strike a firearm enhancement. We modify Roberts's judgment to correct the award of custody credits, but otherwise affirm the judgments in all respects.

**FACTUAL AND PROCEDURAL BACKGROUND**

Around 4:20 p.m. on February 23, 2016, Roberts, Aguilar and three others—Giovanni Tejeda, Brian P., and Dario F.[1]—drove to a 7-Eleven convenience store in Norwalk to buy beer and pizza. Roberts, Aguilar, and Tejeda were members of the Vario Norwalk gang. Dario, who was 14 years old, was not a member of the gang, but he was part of its tagging crew. The 7-Eleven was in Vario Norwalk's territory. Roberts, Aguilar, and Tejeda went inside the store, while Dario and Brian stayed at the car.

Around the same time, Chris B. Sr. and his adult son, Chris B. Jr., arrived at the 7-Eleven. We refer to them as Senior and Junior for the sake of clarity. Senior and Junior were members of the Neighborhood gang, which is a rival to Vario Norwalk. Their monikers were Weasel and Baby Weasel, respectively. Senior

---

[1] To protect their personal privacy interests, we refer to some witnesses by first name and last initial. (Cal. Rules of Court, rule 8.90(b).)

had a Neighborhood tattoo on his chin, and Junior had a visible Neighborhood tattoo on the back of his head.

Dario and Brian noticed Junior's tattoo and went inside the store to alert the others. Roberts pointed at Junior and Senior and said, "that's Weasel and Little Weasel from Neighborhood." Tejeda said, "You're Neighborhood. You're not supposed to be here." Aguilar threw up a Vario Norwalk gang sign. They "talked shit" and told Junior and Senior to leave. Junior and Senior refused.

Junior and Senior started passing something back and forth, and Dario thought it might be a weapon. Dario was scared and walked outside, where he saw Aguilar and Roberts standing together. He heard Aguilar tell Roberts, "give me that." Roberts handed Aguilar a gun, and they went back inside the store.

Aguilar showed Junior and Senior the handle of the gun. Senior immediately ran out the back emergency exit, and Junior followed a few moments later. Aguilar started chasing Junior and Senior, with Roberts and Dario trailing behind.

Aguilar kicked open the back door, and Dario saw Senior and Junior running away outside. Junior tripped while trying to hop over a railing. Aguilar raised the gun and started shooting. Dario heard a man scream and saw Junior on his knees. Aguilar shot Junior a few more times while he was on the ground.

Junior suffered six gunshot wounds, including a fatal wound to the chest. Five of the wounds indicated the bullet travelled from the back of his body to the front. The sixth wound was inconclusive.

After the shooting, Dario, Roberts, Aguilar, and Tejeda ran to their car and drove away. Tejeda and Roberts initially seemed upset with Aguilar for shooting someone in broad daylight.

Tejeda received a phone call from the 7-Eleven cashier, who told him Junior was dead. Tejeda relayed that information to Aguilar and Roberts, who shook hands with a demeanor of "kudos" or "good job."

*Trial*

Aguilar and Roberts were charged by information with the murder of Junior (Pen. Code, § 187, subd. (a))[2] and attempted murder of Senior (§§ 187, subd. (a), 664).[3] On the murder count, it was further alleged that Aguilar, a principal, personally used a firearm (§ 12022.53, subds. (b), (e)(1)), personally and intentionally discharged a firearm (§ 12022.53, subds. (c), (e)(1)), and personally and intentionally discharged a firearm that proximately caused death (§ 12022.53, subds. (d), (e)(1)). It was further alleged the offense was committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)(C)).

At a joint jury trial, the prosecution presented eyewitness evidence and surveillance camera footage establishing the facts recounted above. The prosecution's primary witnesses were Senior and Dario F., both of whom had previously given detailed recorded accounts of the incident.

---

[2]    All further undesignated statutory references are to the Penal Code.

[3]    Tejada was charged with the same offenses and tried jointly with Aguilar and Roberts. He is not a party to this appeal, however, because the jury could not reach a verdict on the murder count and found him not guilty of attempted murder.

4

In addition, the prosecution played for the jury audio recordings obtained during *Perkins* operations conducted on Aguilar and Roberts. (See *Illinois v. Perkins* (1990) 496 U.S. 292, 297.) In a *Perkins* operation, an undercover agent poses as an arrestee with the goal of obtaining an incriminating statement from the suspect. (*Ibid*.) In this case, the police placed paid agents in holding cells with Aguilar and Roberts and recorded the audio of their conversations. Aguilar and Roberts recounted to the agents the circumstances of the shooting, which were generally consistent with the prosecution's other evidence.

To prove the gang allegations, the prosecution presented expert testimony from Detective Ivania Farias. Farias explained territory is important to the Vario Norwalk gang because a loss of territory means a loss of profits through narcotics sales and taxing vendors. When presented with a hypothetical situation generally mirroring the facts of this case, she opined the murder was committed to benefit the gang. She explained it did so by showing the community the gang's members are violent and will commit crimes regardless of the time of day and number of witnesses.

The defendants presented testimony from their own gang expert, Martin Flores. According to Flores, it is safe to assume a gang member in a rival gang's territory is armed, especially if the gang member is acting defiantly.

*Verdicts and Sentencing*

The jury found Aguilar guilty of first degree murder and Roberts guilty of second degree murder. It found true all the related firearm and gang allegations. The jury found both defendants not guilty of attempted murder.

5

The court sentenced Aguilar to an aggregate term of 50 years to life, consisting of 25 years to life for first degree murder plus a consecutive 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)).  It sentenced Roberts to an aggregate term of 40 years to life, consisting of 15 years to life for second degree murder plus a consecutive 25 years to life for the firearm enhancement (§ 12022.53, subds. (d), (e)(1)).  The court did not impose any time for the gang enhancement allegations.

Aguilar and Roberts timely appealed.

## DISCUSSION

### I.  Substantial Evidence Supports the Gang Enhancement Allegations

Aguilar and Roberts contend there is insufficient evidence to support the gang enhancement allegations.  Specifically, they argue the prosecution failed to prove Vario Norwalk's "primary activities" include certain requisite crimes.  We disagree.

#### A.  Relevant Law

Section 186.22, subdivision (b)(1), provides that the trial court shall impose a sentence enhancement upon a defendant "convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ."

Section 186.22, subdivision (f), defines a "criminal street gang" to mean "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more [listed] criminal acts . . . , having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity."

6

The criminal acts to which a gang's "primary activities" relate are enumerated in section 186.22, subdivision (e), and include such crimes as assault with a deadly weapon, robbery, homicide, drug offenses, and grand theft of a vehicle.

The "primary activities" element requires proof that the commission of one or more of the listed crimes is one of the gang's "principal" as opposed to "occasional" occupations. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323–324.) The prosecution may prove the element with evidence that the group's members have consistently and repeatedly committed criminal activity listed in the gang statute. (*Id*. at p. 324.) Alternatively, it may prove the element through expert testimony, which may be based on conversations with gang members, personal investigations of gang-related crimes, and information gathered from colleagues and law enforcement agencies. (*Ibid*.; *People v. Gardeley* (1996) 14 Cal.4th 605, 620, disapproved of on other grounds by *People v. Sanchez* (2016) 63 Cal.4th 665, 683; *People v. Duran* (2002) 97 Cal.App.4th 1448, 1463.)

**B. Background**

Here, the prosecution sought to prove Vario Norwalk is a criminal street gang primarily through expert testimony from Detective Farias. Farias testified that she had been a sworn peace officer for 17 years and was currently assigned to the Major Crimes Bureau, which handles gang investigations. She began her career working in the inmate reception center at the county jail, where she talked to gang members daily. Those conversations touched on gang culture, tattoos, rivalries, territory, and crimes. She was then assigned to the Homicide Gang Task Force, where she investigated gang crimes throughout Los Angeles County.

7

In 2009, Farias was promoted to the Operation Safe Streets Bureau, which is colloquially referred to as the gang unit. For seven years, she was assigned to the Norwalk station and tasked with policing the Vario Norwalk gang. During that time, she investigated numerous cases in which Vario Norwalk gang members were suspects, and routinely spoke to Vario Norwalk members about the gang.

According to Farias, there are around 500 documented members of the Vario Norwalk gang, 60 of whom were active at the time of the incident. Farias testified the gang's "primary activities" are "murder, attempt[ed] murder, gun possessions, robberies, assault with deadly weapon, vehicle thefts, narcotics possessions and sales, [and] robbery." She further testified Vario Norwalk members committed a robbery in 2014 and possession for sale of drugs in 2015.

On cross-examination, Tejeda's counsel attempted to challenge Farias's opinions by showing she did not know how many of the murders and assaults that occurred in Norwalk in 2016 were committed by gang members.

## C. Analysis

Relying on *In re Alexander L.* (2007) 149 Cal.App.4th 605 (*Alexander L.*), Aguilar and Roberts contend Farias's testimony did not constitute substantial evidence to prove the "primary activities" element of the gang enhancements. *Alexander L.*, however, is readily distinguishable. In that case, the totality of the expert's testimony regarding a gang's primary activities was as follows: " 'I know they've committed quite a few assaults with a deadly weapon, several assaults. I know they've been involved in murders. [¶] I know they've been involved with auto thefts, auto/vehicle burglaries, felony graffiti, narcotic violations.' "

8

(*Id*. at p. 611.)  On cross-examination, the expert testified the "vast majority" of cases involving the gang that he was familiar with were "graffiti related."  (*Id*. at p. 612.)

The Court of Appeal concluded the expert's testimony was insufficient because he did not directly testify that the gang's primary activities included statutorily enumerated crimes. (*Alexander L., supra,* 149 Cal.App.4th at pp. 611–612.)  Instead, his testimony suggested the gang's primary criminal activities were "graffiti related."  (*Id*. at p. 612.)  The court further concluded the testimony lacked an adequate foundation because "[i]t is impossible to tell whether [the expert's] claimed knowledge of the gang's activities might have been based on highly reliable sources, such as court records of convictions, or entirely unreliable hearsay."  (*Ibid*.)

Here, unlike the expert in *Alexander L.*, Farias directly and unequivocally testified that Vario Norwalk's primary activities include the commission of enumerated crimes.  Further, unlike the expert in *Alexander L.*, Farias laid a proper foundation for her opinion through extensive testimony regarding her background and experience.  According to Farias, she had spent most of her 17 years as a police officer working assignments connected to gangs.  For seven of those years, she was assigned to the Norwalk station and tasked with policing the Vario Norwalk gang.  During that time, she routinely conversed with Vario Norwalk members and had personally investigated numerous crimes involving the gang.  Although never stated explicitly, it is reasonable to infer this experience was the basis for Farias's testimony regarding Vario Norwalk's primary activities.  Unlike in *Alexander L.*, Farias's expert opinion had an adequate foundation and provided substantial evidence to prove the

9

"primary activities" element of the gang enhancements. (See *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1330 [expert's "eight years dealing with the gang, including investigations and personal conversations with members, and reviews of reports suffices to establish the foundation for his testimony" regarding the gang's primary activities].)[4]

## II.    The Trial Court Was Not Required to Instruct the Jury on Imperfect Self-Defense

Aguilar contends the trial court erred in failing to instruct the jury on voluntary manslaughter based on imperfect self-defense.  We disagree.

### A.    Relevant Law

In *People v. Simon* (2016) 1 Cal.5th 98, our Supreme Court set out the circumstances under which a trial court is required to instruct the jury on imperfect self-defense.  The court explained: "An instance of imperfect self-defense occurs when a defendant acts in the actual but unreasonable belief that he or she is in imminent danger of great bodily injury or death.  [Citation.] Imperfect self-defense differs from complete self-defense, which requires not only an honest but also a reasonable belief of the need to defend oneself.  [Citation.]  It is well established that imperfect self-defense is not an affirmative defense.  [Citation.] It is instead a shorthand way of describing one form of voluntary manslaughter.  [Citation.]  Because imperfect self-defense reduces an intentional, unlawful killing from murder to

---

[4]    Because Farias's expert testimony provided substantial evidence of the "primary activities" element, we need not consider the defendants' argument that the prosecution failed to introduce evidence showing Vario Norwalk members consistently and repeatedly committed enumerated crimes.

10

voluntary manslaughter by negating the element of malice, this form of voluntary manslaughter is considered a lesser and necessarily included offense of murder. [Citation.]

"A trial court has a sua sponte duty to instruct the jury on a lesser included uncharged offense if there is substantial evidence that would absolve the defendant from guilt of the greater, but not the lesser, offense. [Citation.] Substantial evidence is evidence from which a jury could conclude beyond a reasonable doubt that the lesser offense was committed. [Citations.] Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense. [Citations.]

"We review de novo a trial court's decision not to give an imperfect self-defense instruction." (*People v. Simon, supra*, 1 Cal.5th at pp. 132–133.)

### B. Analysis

Aguilar did not request the trial court instruct the jury on imperfect self-defense. Nonetheless, he contends there was sufficient evidence such that the court had a sua sponte duty to give the instruction. In support, he points to testimony from the prosecution and defense gang experts that it is reasonable to expect a gang member in a rival's territory is armed, especially if the gang member is acting defiantly. Aguilar also points to evidence showing he obtained the gun from Roberts shortly after Dario saw Junior and Senior passing something back and forth, which Dario feared might be a weapon.

At most, this evidence shows Aguilar believed Junior and Senior were armed. That is not enough, however, to prove imperfect self-defense, which requires an actual belief in an *imminent* danger of great bodily injury or death.

11

" ' "An imminent peril is one that, from appearances, must be instantly dealt with." ' " (*In re Christian S.* (1994) 7 Cal.4th 768, 783, italics omitted.)  It cannot be prospective, or even in the near future.  (*Ibid*.)  Here, there is no evidence, let along substantial evidence, to support such a finding.  There is nothing in the record, for example, showing Junior or Senior ever brandished or otherwise threatened to use a weapon.  Nor is there evidence suggesting they made any sort of physical movement that Aguilar might have construed as an immediate threat to himself or others.

Instead, according to numerous eyewitnesses, as well as Aguilar's own admissions to the *Perkins* agent, Junior and Senior fled out the back exit shortly after Aguilar returned to the store with a gun.  Aguilar chased after them, kicked open the back door, and shot Junior as he and his father were attempting to run away.  Aguilar then proceeded to shoot Junior several more times while he was on the ground.

Considering all the evidence in the light most favorable to the defense, no reasonable juror could conclude that when he shot Junior, Aguilar actually believed there was an imminent danger of being killed or suffering great bodily injury.  (See *People v. Nguyen* (2015) 61 Cal.4th 1015, 1066 [finding insufficient evidence that the defendant believed harm was imminent when he followed the wounded victim and shot him several times as he lay on the floor].)  The trial court was not required to give an imperfect self-defense instruction under such circumstances.

## III.   The Trial Court Properly Restricted Questioning Regarding The *Perkins* Agent's Physical Appearance

Roberts contends the trial court violated his constitutional rights to due process and to present a defense by precluding him

from eliciting testimony regarding the *Perkins* agent's physical appearance. We disagree.

### A. Background

#### 1. *Roberts's Statements to the* Perkins *Agent*

At the start of their recorded conversation, Roberts told the agent the police had searched his home, which he thought was related to a probation violation. Roberts then told the agent about a separate incident where he beat up a Neighborhood gang member at a swap meet. Roberts did not mention the shooting.

Sometime later, a police officer informed Roberts that homicide detectives wanted to speak with him. When the officer left, Roberts told the agent the police were "gonna try to get me for fucking that shit I didn't do." In response to the agent's questions, Roberts said his "homie" killed someone from Neighborhood. The agent asked what Roberts did, to which Roberts replied "Nothing. It's just because I was right behind." Roberts denied even touching the gun.

Around that point in the conversation, Roberts was removed from the cell and presumably questioned by homicide detectives. When Roberts returned to the cell, he told the agent more details about the shooting. The agent assured Roberts he would be alright so long as the police did not find the gun, and he asked Roberts if he had ever touched it. Roberts responded that he initially had the gun and refused to give it to Aguilar, but eventually he passed it to Aguilar out of view of the cameras. Roberts then ran behind Aguilar as he shot Junior.

The agent asked Roberts, "[I]f you hadn't gave [the gun] to your homeboy, would you have shot that fool?" Roberts responded, "Probably."

## 2. Trial Court Proceedings

Prior to trial, Roberts moved to compel discovery of the agent's identity. The prosecution opposed the motion on the basis that the agent's identity was irrelevant given he was not a percipient witness and would not be called to testify at trial. The prosecution also represented that disclosure of the agent's identity would place his life in extreme danger. The court denied the motion but noted the jury could be appraised of the fact that Roberts was speaking with a paid police agent.

At trial, the prosecution called as a witness the detective who organized the *Perkins* operation. While cross-examining the detective, Roberts's counsel asked whether the same agent was used for the Aguilar and Roberts operations. The detective responded that he would not talk about the identity of the agent, and the prosecutor objected. The court sustained the objection, noting the answer might lead to information regarding the agent's identity.

During a sidebar, Roberts's counsel told the court he intended to ask the detective questions about the agent's appearance, including his age, height, weight, tattoos, and hairstyle. Counsel represented that he intended to argue Roberts was intimidated and "pump[ed] himself up" because the agent looked like an older gangster. The court responded that the defense was entitled to get that general concept out, but it could not do so using a description that might identify the agent. After further discussions about how that could be accomplished, the court ruled the defense could ask the detective whether the agent put on the persona of a gang member, but not about his specific physical characteristics.

14

When cross-examination resumed, Roberts's counsel asked the detective to explain what he told the agent before putting him in the cell. The detective could not recall giving the agent any specific instructions, but he was confident the agent knew what to do because he had acted as an agent before. When asked if he told the agent to act like an "old gangster," the detective replied that he could not recall doing so and he generally does not give such instructions to agents. Roberts's counsel then asked whether the detective would use a "young gang member looking guy" as a *Perkins* agent. The court sustained the prosecution's objection to the question.

Aguilar's counsel subsequently elicited testimony from the detective that agents will sometimes put on a persona of a tough gang member in order to get the suspect to talk. They do so by bragging about criminal acts they did in the past. The detective agreed that part of gang culture is to act tough in order to gain street credibility, and gang members sometimes exaggerate to show how tough and violent they are. He also agreed that it would be frowned upon in gang culture for a young person to act scared or timid around an agent, and a suspect would instead try to make himself seem like a tough gang member.

The defense's gang expert subsequently testified that gang members routinely exaggerate the extent of their criminal behavior. In particular, when confronted with someone who looks more experienced, is larger, or appears more threatening, a young gang member may exaggerate the violent crimes he has committed. Moreover, a young Hispanic inmate would be expected to answer questions posed by an older Hispanic inmate who seems to have clout within a jail.

In closing, Roberts's counsel showed the jury a photograph of Danny Trejo, who is a Latino actor that often portrays criminals.  Counsel then argued the prosecution did not want the jury to know what the *Perkins* agent looked like because it would not be helpful to its case.  Counsel continued, "when you're in the gang culture, when you're someone that has higher ranking or more street credibility you have to answer. . . .  You're gonna be a prey or you're gonna be a predator.  Of course they would exaggerate, of course they would be puffing."

**B. Analysis**

**1. The Court Properly Limited the Scope of Roberts's Cross-Examination**

Roberts contends the trial court erred in limiting the scope of his cross-examination because testimony regarding the agent's appearance was potentially relevant to show his admissions were not credible.  Even if true, that fact alone does not establish error.  Although a defendant has a general right to present relevant evidence, that right is not without limitation and " ' "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." ' " (*Michigan v. Lucas* (1991) 500 U.S. 145, 149.)  As the United States Supreme Court has explained, " 'trial judges retain wide latitude' to limit reasonably a criminal defendant's right to cross-examine a witness 'based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' " (*Id.* at p. 149; see *People v. Simpson* (1962) 203 Cal.App.2d 368, 372 ["The control of cross-examination is within the discretion of the court [citation], and the court may and should limit it within reasonable bounds."].)  We will not disturb

16

a trial court's exercise of that discretion unless it acted in an " ' " 'arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " [Citation.]' " (*People v. Jackson* (2016) 1 Cal.5th 269, 321.)

Here, the trial court recognized evidence related to the agent's physical appearance was potentially relevant to Roberts's defense. Nonetheless, it was concerned that allowing questioning on the subject might inadvertently reveal the agent's identity, which the court had previously ordered not to be disclosed. Although never stated explicitly, it is clear the court feared that identifying the agent would put his life in danger. Given the nature of the agent's work, we do not doubt that fact. In light of this grave risk, the court was rightly hesitant to allow the admission of any potentially identifying information, no matter how generic.

In order to balance this legitimate concern with Roberts's right to present a defense, the court permitted him to elicit testimony regarding the agent's persona, but not about the agent's specific physical characteristics. Such a limitation was a prudent exercise of the court's authority to limit cross-examination. (See *Michigan v. Lucas, supra*, 500 U.S. at p. 149; *People v. Simpson, supra*, 203 Cal.App.2d at p. 372; see also *People v. Hall* (1986) 41 Cal.3d 826, 834 [trial courts possess "traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice."].) The court did not act in an arbitrary, capricious, or patently absurd manner.

Relying on *Crane v. Kentucky* (1986) 476 U.S. 683 (*Crane*), Roberts insists the court's limitation on his cross-examination violated his constitutional rights to due process and to present a

17

defense.  Such reliance is misplaced.  In *Crane*, the prosecution's case rested almost entirely on the defendant's confession.  (*Id*. at p. 685.)  The trial court, however, precluded the defendant from introducing any evidence regarding the circumstances of that confession—such as the length of the interrogation and the way it was conducted—to show it was not credible.  (*Id*. at pp. 685–686.)  The Supreme Court concluded this was error, explaining that without the ability to describe for the jury the circumstances that prompted his confession, the defendant was "effectively disabled from answering the one question every rational juror needs answered:  If the defendant is innocent, why did he previously admit his guilt?"  (*Id*. at p. 689.)  Accordingly, the court held the "wholesale exclusion" of evidence regarding the circumstances of the defendant's confession deprived him of his fundamental constitutional right to a fair opportunity to present a complete defense.  (*Id*. at pp. 690–691.)

Here, in contrast, the trial court did not categorically bar Roberts from introducing evidence regarding the circumstances of his admissions.  Rather, it imposed only a single limitation:  that he not elicit testimony regarding the agent's physical appearance. Roberts was otherwise free to introduce evidence regarding the circumstances of his admissions, including any other evidence reflecting on the agent's persona.  Moreover, as we discuss in the next section, the record at trial contained more than sufficient evidence from which Roberts could argue his defense to the jury. Indeed, the record was so replete with such evidence that the marginal value of testimony regarding the agent's physical appearance was essentially nil.  The trial court's relatively minor restriction did not deprive Roberts of the opportunity to present a complete defense, nor did it otherwise violate his constitutional

rights. (See *People v. Thornton* (2007) 41 Cal.4th 391, 452–453 ["short of a total preclusion of defendant's ability to present a mitigating case to the trier of fact," there is no constitutional violation]; *People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1457 [there is no constitutional violation unless the excluded evidence is competent, substantial, and of significant value].)

### 2. Any Error Was Harmless

Even if the trial court erred in limiting Roberts's cross-examination of the detective, reversal is not required because any error was harmless.

Initially, the parties disagree as to the proper harmless error standard. Roberts contends the court's error resulted in a violation of his constitutional rights, and he therefore urges us to apply the federal standard articulated in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). Under *Chapman*, an error is harmless if it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Id*. at p. 24.)

The Attorney General contends there was no constitutional violation because the trial court's evidentiary ruling did not completely foreclose Roberts's defense. Therefore, he argues, the proper standard is the one set forth in *People v. Watson* (1956) 46 Cal.2d 818, which requires reversal only if there is a reasonable probability the defendant would have received a more favorable result absent the error.

We agree with the Attorney General. As we discussed in the previous section, the trial court did not totally preclude Roberts from presenting a defense to the jury; rather, it imposed a relatively minor restriction on his ability to elicit testimony that was only potentially relevant to his defense. Therefore, even

19

if the court erred, such an error did not implicate Roberts's constitutional rights. Under these circumstances, we apply the *Watson* standard of review. (*People v. Boyette* (2002) 29 Cal.4th 381, 428 [*Watson* standard applies when " ' "there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense." ' "].)

Roberts insists testimony regarding the agent's physical appearance would have supported his defense that his admissions were not credible. More specifically, he contends it would have helped prove he felt compelled to answer the agent's questions and exaggerated his involvement in the shooting either because he believed the agent was an older and more experienced gangster, or because he was physically intimidated by the agent. Considering the entire record, it is not reasonably probable the jurors would have accepted either of these theories had they heard testimony regarding the agent's physical characteristics.

With respect to the first theory, the recording of Roberts's conversation with the agent—which was played for the jury at trial—leaves no doubt that the agent was older than Roberts and had adopted the persona of an experienced gangster. Throughout the conversation, the agent conveyed a deep familiarity with gang culture, strongly implying he was a gang member. The agent, for example, frequently used gang lingo and slang, and greeted Roberts by asking "where you from," which is a common way gang members ask someone to identify his or her gang affiliation. The agent also responded to Roberts's recounting of the shooting by remarking, "that's what [Junior and Senior] get," implying he was familiar with, and approved of, the consequences for gang members who are caught in a rival gang's territory. At another

20

point, the agent strongly implied that he, too, had been involved in violent encounters with rival gangs.

The agent also portrayed himself as an experienced and violent criminal. For example, he told Roberts the police recently showed up at his home in "tanks," which implied they viewed him as a serious threat. He also implied he had been charged with attempted murder, served time in prison, and stored guns in his home, one of which had been used in a crime. Moreover, the fact that the agent implied he had previously been incarcerated clearly conveyed that he was older than Roberts, who was only 18 years old at the time.

The agent further signaled his age and experience by frequently giving Roberts advice on how to handle his criminal case. The agent, for example, advised Roberts on the likely amount of his bail, that he would have to put up a house as collateral to make bail, and that he should demand the police show him any evidence they had against him. The agent also told Roberts to come up with a good cover story and physically destroy the gun that was used in the shooting so the police could not recover it.

It is also apparent from the recording that Roberts believed the agent's persona was sincere. Roberts, for example, introduced himself to the agent using his gang moniker "Sporty." In contrast, when a police officer asked Roberts if he could call him by that name, Roberts replied, "I don't know what you're talking about." It also strains credulity to think Roberts would be so forthcoming about his involvement in criminal activities if he had any suspicion the agent was concealing his true identity.

The recording alone provided overwhelming evidence the agent convincingly portrayed himself as an older and more experienced gangster; upon listening to the recording, no reasonable juror could have concluded otherwise. Any evidence regarding the agent's physical characteristics that may have reflected on that issue—such as his age, haircut, and tattoos—would have been entirely superfluous. Accordingly, it is not reasonably probable the introduction of such evidence would have resulted in a more favorable result for Roberts on this theory of defense.

The same is true of Roberts's alternative theory, which is that he was physically intimidated by the agent and exaggerated his involvement in the shooting as a result. The problem with the theory is that the evidence presented at trial overwhelmingly shows Roberts opened up to the agent not because he felt threatened, but because he felt comfortable. The recording of their conversation, for example, reveals it was friendly and casual throughout. The agent frequently reassured Roberts that he would be alright, gave him solicited and unsolicited advice on his criminal case, and implied he would be safe in jail. Roberts, moreover, initially denied any involvement in the shooting, and revealed his role in the crime only after he and the agent had built more rapport. This sequence of events would make no sense if Roberts viewed the agent as a physical threat and wanted to make himself appear more violent.

In light of this overwhelming evidence, no matter how physically imposing the agent might have appeared, no reasonable juror could conclude Roberts exaggerated his involvement in the shooting because he felt threatened. As a result, it is not reasonably probable Roberts would have obtained

a more favorable result had the court permitted testimony regarding the agent's physical appearance.  Any error was harmless and does not require reversal.

## IV.  The Trial Court Did Not Abuse Its Discretion by Declining to Strike Roberts's Firearm Enhancement

Roberts contends the trial court abused its discretion by declining to strike the firearm enhancement imposed under section 12022.53, subdivision (d).  We disagree.

### A.  Relevant Law

Effective January 1, 2018, trial courts have discretion under section 1385 to strike previously mandatory firearm enhancements "in the furtherance of justice."  (§ 1385, subd. (a); see § 12022.53, subd. (h).)  To decide whether striking an enhancement would be "in the furtherance of justice," the court must consider the rights of the defendant and interests of society represented by the People.  (*People v. Rocha* (2019) 32 Cal.App.5th 352, 359; *People v. Orin* (1975) 13 Cal.3d 937, 945.)  It should also "consider the nature and circumstances of the defendant's current crimes, the defendant's prior convictions, and the particulars of his or her background, character, and prospects."  (*People v. Orabuena* (2004) 116 Cal.App.4th 84, 99.)  We review the trial court's decision not to strike a firearm enhancement for abuse of discretion.  (*People v. Pearson* (2019) 38 Cal.App.5th 112, 116 (*Pearson*).)

### B.  Background

With respect to Roberts, the prosecution alleged, and the jury found true, three separate firearm enhancement allegations under section 12022.53, subdivisions (b), (c), and (d).  The court imposed the enhancement under subdivision (d), which carried the longest term of imprisonment.  At sentencing, the court noted

23

it had discretion to strike the enhancement but explained it would not do so because Roberts was "intricately involved in this whole transaction."  In support, the court pointed to the facts that Roberts is a gang member who participated in a gang attack, he provided the murder weapon to Aguilar, and there would not have been a murder without Roberts's direct assistance.  Roberts did not object.

### C. Analysis

Roberts contends the trial court abused its discretion by (1) failing to consider mitigating factors, (2) failing to realize it had discretion to impose lesser enhancements, and (3) improperly relying on elements of the underlying conviction and gang enhancement.  The Attorney General insists Roberts forfeited these arguments by failing to raise them below.  We agree with the Attorney General.[5]

"[C]omplaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal."  (*People v. Scott* (1994) 9 Cal.4th 331, 356.)  This includes claims that the trial court failed to consider mitigating factors (*People v. Kelley* (1997) 52 Cal.App.4th 568, 582), failed to exercise its discretion to impose a lesser firearm enhancement (*People v. Yanez* (2020) 44 Cal.App.5th 452, 460), and made improper dual use of facts (*People v. De Soto* (1997) 54 Cal.App.4th 1, 8).  Here, Roberts did

---

[5]  For the first time in his reply brief, Roberts contends his trial counsel provided ineffective assistance by failing to assert proper objections below.  The argument is untimely and we do not consider it.  (See *People v. Robinson* (2002) 104 Cal.App.4th 902, 905.)

24

not raise in the trial court any of the arguments he now advances on appeal. His failure to do so forfeited the issues.[6]

Even if we were to overlook the forfeiture, we would reject Roberts's arguments on the merits. Roberts contends the trial court erred in failing to consider the mitigating factors of his youth and background. Absent a contrary affirmative showing in the record, however, we presume the trial court considered the relevant sentencing factors when deciding whether to strike or dismiss an enhancement. (*Pearson, supra,* 38 Cal.App.5th at p. 117; *People v. Kelley* (1997) 52 Cal.App.4th 568, 582.) The court, moreover, is not required to set out its reasons for accepting or rejecting certain factors. (*People v. Jones* (1985) 164 Cal.App.3d 1173, 1181; see *People v. Gillispie* (1997) 60 Cal.App.4th 429, 433 ["trial court is not required to state reasons for declining to exercise its discretion under section 1385"].) Here, the record does not affirmatively show the court ignored any relevant mitigating factors when considering whether to strike the firearm enhancement. As such, we must presume it properly considered them.

For similar reasons, we are unpersuaded by Roberts's argument that resentencing is necessary because the trial court did not recognize it had authority to impose lesser enhancements under section 12022.53, subdivisions (b) and (c). According to Roberts, because neither the court nor the parties mentioned the lesser enhancement allegations, the only reasonable inference is

---

[6] In passing, Roberts contends he did not have an opportunity to object because the trial court moved through sentencing quickly and only specifically asked if he wished to be heard on the amount of restitution. The transcript of the sentencing hearing does not support this contention; rather, it shows Roberts had ample opportunity to interpose objections.

the court forgot they existed.  We disagree.  In the absence of any affirmative indication in the record, we presume the trial court correctly applied the law and understood the scope of its discretion.  (See *People v. Morrison* (2019) 34 Cal.App.5th 217, 225 ["the usual presumption that a sentencing court correctly applied the law . . . will ordinarily prevent remand where the record is silent as to the scope of a court's discretion"]; *People v. Lee* (2017) 16 Cal.App.5th 861, 867 [where the record is silent, the appellant has not met his burden or showing the trial court was unaware of discretionary authority].)  Here, there is nothing in the record suggesting the trial court was not aware the jury found true the allegations under section 12022.53, subdivisions (b) and (c).  Nor is there anything to suggest the court was unaware it had the authority to impose such lesser enhancements in the event it struck the enhancement under section 12022.53, subdivision (d).  Accordingly, we presume the court understood it had such authority, but simply declined to exercise it.

Finally, we reject Roberts's claim that, in declining to strike the firearm enhancement, the trial court improperly relied on the same facts that were used to convict him of aiding and abetting a gang murder.  According to Roberts, such a dual use of facts is prohibited under California Rules of Court, rule 4.420(d).  Rule 4.420(d) precludes a trial court from considering "a fact that is an element of the crime on which punishment is being imposed" when exercising discretion to select one of the three authorized terms of imprisonment referred to in section 1170, subdivision (b).  It has no application where, as here, the court is deciding whether to strike a firearm enhancement.

## V.    Roberts is Entitled to An Additional Day of Custody Credit

Roberts contends, and the Attorney General concedes, the trial court erroneously awarded him 1142, rather than 1143, days of custody credit. We agree. A defendant is entitled to credit against a term of imprisonment for days spent in custody before sentencing, which includes the day of arrest and day of sentencing. (§ 2900.5, subd. (a); *People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48.) Roberts was arrested on April 21, 2016, and sentenced on June 7, 2019. Accordingly, he is entitled to 1143 days of custody credit, and we modify the judgment accordingly.

## DISPOSITION

We modify Roberts's judgement to award him 1143 days of custody credit. The judgments are affirmed in all other respects.

The trial court is ordered to issue an amended abstract of judgment reflecting Roberts's correct custody credits. The amended abstract of judgment shall also reflect that Roberts was convicted of second degree murder.[7] The court shall forward the amended abstract of judgment to the Department of Corrections and Rehabilitation.


BIGELOW, P. J.

We Concur:


STRATTON, J.          WILEY, J.

---

[7]    The original abstract of judgment states Roberts was convicted of first degree murder.